IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PHILLIP D. PUGH,                    )
                                    )
              Plaintiff,            )
                                    )
     v.                             )        1:16-cv-1030
                                    )
DAVID J. SHULKIN, in his            )
official capacity as                )
Secretary, Department of            )
Veterans Affairs,[1]                )
                                    )
              Defendant.            )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

Plaintiff Phillip Pugh brought this action against Defendant David J. Shulkin, M.D., Secretary of the Department of Veterans Affairs ("VA"), raising a number of claims of employment discrimination by the Durham Veterans Administration Medical Center (the "Durham VA"). Pugh alleges discrimination based on race, age, and disability; retaliation; hostile work environment; and, he contends, a violation of the Whistleblower Protection Act, 5 U.S.C. § 2301(b), et seq. Before the court is the Secretary's motion for summary judgment as to all claims (Doc. 26) and motion to strike Pugh's jury demand as to his age discrimination claim (Doc. 51). The court heard argument on the motions on March 27,

---

[1] Dr. Shulkin became the Acting Secretary of Veterans Affairs on February 14, 2017, resulting in his substitution as Defendant, pursuant to Federal Rule of Civil Procedure 25(d). However, on March 28, 2018, the President dismissed Mr. Shulkin and named the Honorable Robert Wilkie to serve as the Acting Secretary.

2018.   For the reasons stated below, the motion for summary judgment will be granted, and the motion to strike will be denied as moot.

I.   **BACKGROUND**

The court views the facts in the light most favorable to Pugh, as the nonmoving party.

Pugh is a blind African-American man in his sixties.  (Doc. 27-2 at 10.)  From 1996 to 2012, he worked at the Durham VA as the Visual Impairment Services Team ("VIST") Coordinator.  (Id. at 16.)  He was permitted to work with limited supervision and reported directly to the VA Chief of Staff.  (Id. at 19–20.)

In 2009, the Durham VA realigned the VIST program under the Eye Clinic and Surgical Services program.  (Id. at 19.)[2] Thereafter, Pugh was supervised by Dr. Sharon Fekrat, who was the Chief of Ophthalmology in the Eye Clinic.  (Id. at 20–21.)  Dr. Fekrat was only at the Durham VA part time, however, and so she relied on Kuruvilla Kurian, Ph.D., the Administrative Officer in the Eye Clinic, and LaTisha Blacknall, a Medical Support Assistant in the Eye Clinic, for assistance with VA policies and procedures. (Doc. 27 at 3.)

Pugh claims that before and after being aligned under the Eye

---

[2] Pugh has since made numerous requests, as recently as April 2012, to be aligned back under the Chief of Staff, all which have been denied. (Doc. 35 at 4; Doc. 40-5 at 3.)

Care Clinic, he became subjected to a hostile work environment by Dr. Kurian and that the management at the Durham VA began a concerted effort of harassment and retaliation. He alleges that the realignment was part of the harassment, claiming that in 2008 he overheard Dr. Kurian stating that he was a "lone wolf" who was "poorly supervised" and that the VA needed to "reel his ass in." (Doc. 27-2 at 63.)

By all appearances, Pugh enjoyed a good relationship with the veterans that came through the clinic, and, starting in 2009, he encouraged them to write to the Secretary to request more resources for the VIST program. (Doc. 34-4 at 2; Doc. 35 at 2.) In August of 2011, Dr. Fekrat, Dr. Kurian, and another VA official met with Pugh and told him that he was too close to the veterans and should stop having them write complaints to the "Secretary, Congress, and others in the chain of command." (Doc. 40-1 at 1.) It also appears that the Durham VA expressed satisfaction with Pugh's work through September 30, 2011. Pugh received "excellent" and "fully successful" reviews in his performance evaluations between 1999 and September 30, 2011, and he was given several cash awards for his performance over that time period. (Docs. 37-1 through 39-7.)

In 2011, the Prosthetic Service, which serves as a purchaser of VA equipment, raised concerns about how Pugh was managing the

Computer Assisted Training ("CAT") program. (Doc. 29—1 ¶ 5.)[3] The way the system worked, Pugh would enter a consult request for CAT services in the Durham VA's computerized records, which would have to be signed off and approved by a physician who had ordering privileges. (Id. ¶ 4.) In Pugh's case, this was Dr. Fekrat, as Chief of Ophthalmology. (Id.) In early 2012, Dr. Fekrat "became concerned about seeing repeated requests for training for a small number of veterans[,] and she became increasingly uncomfortable about signing off on those orders without being able to be reassured that the services were clinically appropriate." (Id. ¶ 3.) Dr. Fekrat was concerned that veterans "were being provided CAT over years without clear treatment plans or defined end points." (Id. ¶ 4.) She shared her concerns with Sara Haigh, the Assistant Director and, at times, Acting Associate Director of the Durham VA, who contacted Cezette Leopold, the Chief of Prosthetics. (Id. ¶¶ 1, 4.) Based on her contact with Leopold, Haigh became troubled about the number of training hours required in the CAT program, how the program assessed outcomes, its vendor relationship, and the program's overall cost. (Id. ¶ 4.)

In response to these reports, the Prosthetics Service pulled data on the CAT program for an eighteen month period and found that "out of eighty-eight total patients, thirteen of those

---

[3] Pugh says this was because of the Durham VA's record-keeping problems. (Doc. 58 at 2.)

patients received about a hundred and eighty thousand dollars of computer training" and "the remaining seventy-five patients received about a hundred and four thousand dollars of computer training." (Id.) Further investigation showed that some of the thirteen patients in the first group received "over two hundred hours of training over the course of three years for a grand total of three hundred thousand dollars." (Id.) This led to "a great deal of concern about vendor payments, the process for referring these payments[,] and whether their large number of training hours were clinically necessary." (Id.) It was reported to Haigh that "the training sessions were being used for more of a social gathering among a small group of veterans and was not, in fact, clinical direct training with defined goals and objectives." (Id.) Doubts became so great that "at one point [Leopold] refused to pay invoices because she was so concerned about the CAT program." (Id. ¶ 5.)

In February of 2012, Pugh met with Paul Moton (the Blind Rehabilitation Outpatient Specialist ("BROS") hired in 2009 and who also worked as part of the Eye Clinic), Dr. Kurian, Dr. Fekrat, and Blacknall about Pugh's performance. (Doc. 28-3 at 61–62.) Moton felt that he was not getting enough referrals from Pugh. The Eye Clinic team met several times to encourage increased collaboration on patient referrals and to encourage Pugh to schedule an appointment with Moton for each of his patients. (Doc.

29-1 ¶ 6.)[4]  In a May 29, 2012 email to Pugh and others, Haigh directed Pugh to follow Dr. Fekrat's instructions as to several matters, including entering progress notes and treatment plans promptly, closing the encounter within twenty-four hours, following the scheduling process developed by the Eye Clinic team, and adding Dr. Fekrat as an additional signer to progress notes and consult requests.  (Id.)

Around this time, Pugh, who to this point had the authority to schedule appointments, was informed that the VA was moving toward the use of designated schedulers for patient appointments and that he would no longer be able to schedule appointments for his patients on his own.  (Doc. 27-2 at 67.)  Pugh viewed this change as a form of harassment, despite the fact that Moton also lost the ability to schedule appointments for his patients and that the VA was implementing this move across the country.  (Id. at 68; Doc. 28-3 at 66, 76.)[5]  Pugh also made several requests to have his ability to schedule appointments reinstated, all of which were denied.  (Doc. 40-5 at 2–3.)

In May of 2012, Dr. Kurian was on a confidential teleconference with VA employees responsible for categorizing

---

[4] Pugh believes that Moton was jealous of him and wanted to take Pugh's position.  However, this idea is supported only by Pugh's own testimony. (Doc. 27-2 at 44–46.)

[5] Pugh says that the reason Dr. Fekrat gave for removing his scheduling privileges was that "It's [my] way or the highway."  (Doc. 27-2 at 108.)

employees into various governmental positions (known as "boarding"), and the topic turned to VIST Coordinators being boarded into a "Hybrid Title 38" position.[6] (Doc. 40-7 ¶¶ 10-12.) An employee boarded into a Hybrid 38 position would be eligible for a promotion if the boarding process indicated that the employee was performing above his GS level at the time of boarding. (See Doc. 40-8.) During this call, Dr. Kurian asked what would happen to a VIST Coordinator who was detailed away from his position during the boarding process. (Doc. 40-7 ¶ 12.) This caused Cheryl Hunt, who was also on the conference call and who worked on the Hybrid Title 38 conversion process, to immediately advise Pugh of the discussion out of her concern for his position. (Id. ¶ 13.)

On May 31, 2012, Pugh was bitten by a tick and became ill. (Doc. 40-5.) As a result, on June 6, 2012, he requested a combination of authorized absence, annual leave, and comp time to be absent June 6-8, 2012. (Doc. 27 at 6-7.) His leave was initially denied on the ground he failed to give the required 30-

---

[6] Cheryl Hunt, a former VIST Coordinator who participated in the National Hybrid Title 38 conversion, states that this was a process in which the VA made changes so that certain employees would "become Hybrid Title 38 employees, which is a combination of Title 5 and Title 38." (Doc. 40-7 ¶ 6.) During this process, each VIST Coordinator in the VA "had to be boarded into Blind Rehab Service as Blind Rehab Specialists regardless of their background or degrees. If they met the qualifications based on the position description, they would be boarded as a Blind Rehab Specialist." (Id.) Hunt stated that, while working on the Hybrid Title 38 boarding process, she "would determine if the candidates would come in as a GS-12, GS-11, or sometimes GS-9," without reference to GS-13. (Id. ¶ 10.)

days' advance notice for annual leave. (Id.; Doc. 30-1 ¶¶ 10-12.)[7] Pugh then changed his request to sick leave, which was approved, and he was absent from work on approved sick leave from June 6 until October 15, 2012. (Doc. 30-1 ¶ 16.) During Pugh's absence, Dr. Kurian contacted him to inquire about the status of his leave and to inform him of the consequences of being absent without putting in the appropriate type of leave. (Id. ¶¶ 13-15.)

Also on June 6, 2012, Moton sent an email to Dr. Kurian and Dr. Fekrat that contained allegations about Pugh of what the Durham VA's executive leadership team (Haigh, the director of the Durham VA, the chief of staff, and the nurse executive) considered to be "potential patient neglect or possibly patient abuse." (Doc. 28-1 at 150; Doc. 29-1 ¶ 7.) Of particular concern to Haigh and other members of the Durham VA's executive leadership team was the email's statement that "veterans are afraid to speak up because they fear they will not receive their computer or other blind aids." (Doc. 29-1 ¶ 7.) Haigh felt that this email "explicitly implied that veterans were afraid to speak up or were not receiving

---

[7] Pugh argues that there was no such 30-day policy and that Dr. Kurian was simply harassing him. (Doc. 35 at 5-6.) In support of this, Pugh claims that the 2011 Sick Leave Policy did not have a 30-day notice requirement. (Doc. 47-4.) In his declaration, Dr. Kurian contends that there was a 30-day notice policy for an employee to take his annual leave, as opposed to sick leave. (Doc. 30-1 ¶¶ 10-13.) There is a memorandum, dated August 2011, attached to Dr. Kurian's declaration which notes that "[a]ll requests for annual leave should be made in advance and are subject to supervisory approval." (Doc. 30-4 at 8.) However, this memorandum does not state that there is a 30-day requirement for requesting annual leave.

needed services." (Id.)

This email, along with previously existing concerns about the CAT program, led the Durham VA's executive leadership team to request a site visit by the Blind Rehabilitation Service of the VA Central Office to investigate possible irregularities. (Id.) Because of this request for an investigation and in accordance with the VA's policy, Pugh, although then on leave for his tick bite, was temporarily detailed to work in the Durham VA's Logistics section, where his access to computer and work files would be restricted to ensure the integrity of the records for the duration of the investigation. (Doc. 28-4 ¶ 4; Doc. 29-1 ¶¶ 8-9.) The decision to move Pugh to Logistics was made on June 8, 2011, with the assumption that he would return to work on June 11, 2011, and was an attempt to quickly find a detail for him where he could be productive, considering his blindness. (Doc. 28-4 ¶ 4.) It was the view of the Durham VA Human Resources staff that Pugh could be productive by reviewing a backlog of documents as part of his detail to Logistics. (Id.) The detail to Logistics meant that Pugh would be working in the Durham VA warehouse but did not result in any decrease in grade or pay. It also meant that for the duration of the detail, Pugh's compressed tour of duty (meaning that he worked four ten-hour days, rather than five eight-hour days) was terminated, and his access to the Surgical Service

department was restricted.  (Doc. 47-6.)[8]

Though apparently contemplated in early June, the site visit from the VA Central Office occurred June 27 through 29, 2012.  It was conducted by Gale Watson, National Director of Blind Rehabilitation Service, and Michael Williams.  (Doc. 29-1 ¶ 11.)  Both expressed concern about possible improper vendor relationships, payment patterns, and control of VA-issued equipment.  (Doc. 30-11 ¶ 3.)  Watson prepared a report that she sent to the Medical Center Director at the Durham VA that summarized these concerns.  (Doc. 30-12.)  According to the report, the investigators uncovered "significant issues" with the CAT program, documentation and treatment plans for veterans, inventory management, handling of equipment between patients, "and a significant concern for potential fraud and abuse such that they advised [the Durham VA management team] to immediately contact the Inspector General to do a criminal based investigation."  (Doc.

_____

[8] Pugh also emphasizes that his being detailed away from his VIST position meant that he was not "grandfathered in" as a Hybrid Title 38 Blind Rehabilitation Specialist in October of 2012, as he claims VIST Coordinators in other VA facilities were.  (Doc. 35 at 7.)  Pugh claims that had he undergone the boarding process, he would have been able to increase his GS level.  (Id.)  However, Pugh would not have automatically become a GS-13 had he participated in the boarding process; he may simply have been eligible for a promotion to that level.  (Doc. 28-3 ¶ 14; Doc. 40-8 at 13.)  Given that Hunt testified that the boarding process was only determining whether the candidates "would come in as a GS-12, GS-11 or sometimes GS-9," there is no support for the claim that Pugh would have been made a GS-13 had he undergone the boarding process.  (Doc. 40-7 ¶ 10.)  It is further damaging to Pugh's claim that Haigh testified that Pugh could not be boarded because he did not have a performance appraisal rating for 2012 due to his significant absence from work that year.  (Doc. 29-22.)

29-1 ¶ 11; Doc. 30-12.) The recommendation for a criminal investigation related to concerns over fraud, collusion with the vendor, and the giving of a refurbished computer to a veteran even though a new one was ordered. (Doc. 29-1 ¶ 11.) In addition, the report recommended the following: (1) that the CAT program be placed under the review of Moton, rather than the VIST Coordinator (i.e., Pugh); (2) that the VA no longer use the CAT vendor, John Lee, it had been using through Pugh; (3) that the VA develop clearer standards for the CAT program; (4) that Pugh be offered counseling and support for apparent suicidal ideation; and (5) that the VA appoint "a strong VIST Chair to work with BROS during the period without a full-time VIST coordinator." (Doc. 30-12.) This report was presented with a "strong sense of seriousness pertaining to the concerns the site visit team had." (Doc. 29-1 ¶ 16.)

After the site visit, the VA concluded that VIST Program Management was not meeting the requirements of the program, as seventy percent of the veterans had not received their evaluation in over three years, even though this was an annual requirement. (Id. ¶ 12.) In addition, concerns, reflected in the site visit report, that there was "a financial relationship" or "financial linkage" between Pugh and Lee led to a preliminary investigation of the CAT program by the Office of the Inspector General. (Doc. 29-1 ¶ 17; Doc. 42-1 ¶ 3.) This investigation determined that

there was insufficient evidence for the case to the referred to the United States Attorney for prosecution. (Doc. 42-1 ¶ 3; Doc. 45.) The matter was eventually referred back to the Durham VA for appropriate administrative action. (Doc. 42-1 ¶ 3.)[9]

On July 16, 2012, Pugh filed his first informal Equal Employment Opportunity ("EEO") complaint, claiming discrimination based on race, disability, and harassment, as well as unfair personnel practices. (Doc. 35 at 7.)

Due to his absence from work for health concerns, Pugh did not report to the warehouse for the detail to Logistics until October 15, 2012.[10] (Doc. 27 at 7.) That same day, EEO Manager Odessa Wright learned that Pugh was working in the warehouse, and she immediately went to see him. (Doc. 28-2 at 55.) Although Wright believed the room where Pugh was located was fine, she felt that the path to the room posed potential obstacles. (Id. at 19–20.) Therefore, with Human Resources' concurrence, she immediately moved him to a conference room in her building. (Id.

---

[9] At the hearing on the present motions, Pugh attempted to downplay the severity of both the VA Central Office site visit and the Inspector General's "preliminary inquiry," because they did not lead to the finding of any criminal wrongdoing.

[10] Pugh has submitted declarations from several employees from the warehouse who state that they did not feel it was a safe place for Pugh to be located. (Docs. 47-7 through 47-9.) While they did not agree with the Durham VA's decision to place Pugh in the warehouse, these employees claim they could not change it because the VA's human resources personnel forced Pugh into the warehouse. (Docs. 47-7 through 47-9.)

at 22–23.)[11]  Also on that same day, the Durham VA reassigned Pugh to a detail in the Durham VA's Education section.  (Doc. 27-2 at 79; Doc. 41-2.)  However, Pugh either did not receive, or acknowledge receipt of, the memorandum assigning him to Education until October 24, 2012.  (Doc. 41-2.)

While the ongoing investigations of the VIST program and Pugh's management of it were underway, the Durham VA had authorized a second VIST Coordinator position and allowed immediate recruitment for it.  (Doc. 28-4 ¶ 8.)  The job announcement was issued on October 22, 2012.  (Id.)  Pugh applied for the position but was not interviewed because the Human Resources Chief, Jerry Freeman, determined that Pugh already occupied a VIST position. (Id. ¶ 10.)  No selection was made from the second VIST Coordinator announcement.  (Id.)  The position was later filled by Monica Grotte, a 29 year-old Caucasian candidate from the Durham VA's intern program.  (Id. ¶ 11; Doc. 35 at 8.)  Pugh claims, without any supporting evidence, that the "VA had a pattern of hiring young Caucasian female interns and applicants from these type of

_____

[11] Pugh recalled in his deposition that Wright moved him from the warehouse into "the EMS break room in building 6" on October 17 and that he spent October 15 and 16 sitting in a break room in the warehouse. (Doc. 27-2 at 92–93.)  Wright's deposition indicates that she went to see Pugh on the first day he returned to work and that she placed him in a safe location (although she could not remember exactly where) that she stated "was a conference room in that building" on that same day. (Doc. 28-2 at 22–23, 55.)  In any event, it is uncontested that the decision to move Pugh was made the day he reported back to work from his leave, October 15, and the duration of his presence in the warehouse was brief.

positions while pushing out the older seasoned employees." (Doc. 58 at 8.)

On April 15, 2013, Pugh was permanently reassigned to the position of Blind Rehabilitation Specialist in the Durham VA's Education section, with no change in grade or pay. (Doc. 27-2 at 160.)[12] The memorandum that informed Pugh of this reassignment notes that the VA Central Office report found several deficiencies that were "determined to be primarily performance related" and that "management has lost confidence in [Pugh's] ability to successfully manage the VIST program." (Id.) While Pugh's grade, GS-12, did not change, his position was later classified as GS-11. (Doc. 28-4 ¶ 16.) Thus, Pugh is paid at the GS-12 level and still carries his service at the GS-12 level for the purposes of qualifying, and applying, for higher grade positions, despite the fact that the title he holds is a GS-11 position. (Id. ¶ 17.) Pugh claims this permanent assignment as Blind Rehabilitation Specialist in Education was a demotion.

Pugh filed this lawsuit on August 5, 2016. (Doc. 2.) The VA moved for summary judgment on November 6, 2017. (Doc. 26.) On March 27, 2018, the court held a hearing on the motion. The motion

---

[12] In an email, Pugh stated that he was "looking forward to working with you all to increase recruitment and hiring of individuals with handicaps." (Doc. 28-11 at 1.) The record indicates that through September 30, 2015, Pugh has been "fully successful" (but not "excellent") in all his evaluations since his detail to the Education section. (Docs. 28-16 through 18.)

14

has been fully briefed and is ready for decision. (Docs. 27, 33, 35, 42, 47.)[13]

## II. ANALYSIS

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Basnight v. Diamond Developers, Inc., 146 F. Supp. 2d 754, 760 (M.D.N.C. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining a motion for summary judgment, the court views the "evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." Id. Summary judgment should be denied "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Guessford v. Pennsylvania Nat. Mut. Cas. Ins. Co., 983 F. Supp. 2d 652, 659 (M.D.N.C. 2013) (quoting Campbell v. Hewitt, Coleman & Associates, Inc., 21 F.3d 52, 55

---

[13] The VA notes that Pugh's response was filed one day late, that many of the attached exhibits violate local rules in that they contain unredacted personal identifiers, and that some of the exhibits Pugh cites are not attached. (Doc. 42 at 2 n.1). In light of the court's ruling granting summary judgment, these contentions need not be addressed.

(4th Cir. 1994)).

**B.    Race and Age Discrimination**

Pugh claims race discrimination under Title VII, 42 U.S.C.
§ 2000e-16, which provides that "[a]ll personnel actions affecting
employees . . . shall be made free from any discrimination based
on race, color, religion, sex, or national origin."  He claims age
discrimination under the federal-sector provisions of the Age
Discrimination in Employment Act of 1967, 29 U.S.C. § 633a(a),
which provides that "[a]ll personnel actions affecting employees
or applicants for employment who are at least 40 years of age . .
. shall be made free from any discrimination based on age."  Pugh
offers no direct evidence of race or age discrimination.  As a
result, he must proceed under the McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973), framework.  If he can establish a prima facie
case of discrimination, the burden shifts to the defendant to
produce evidence that it took the adverse employment action for a
legitimate, nondiscriminatory reason.  See, e.g., St. Mary's Honor
Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Texas Dep't of Cmty.
Affairs v. Burdine, 450 U.S. 248, 252-54 (1981).  If the defendant
meets this burden of production, Pugh must prove by a preponderance
of the evidence that his employer's stated reason for taking the
adverse employment action was a mere pretext for discrimination.
See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.
133, 143 (2000); Hill v. Lockheed Martin Logistics Mgmt., Inc.,

354 F.3d 277, 285 (4th Cir.2004) (en banc), <u>abrogated on other grounds by</u> <u>Univ. of Texas Sw. Med. Ctr. v. Nassar,</u> 570 U.S. 338 (2013).  An adverse employment action is a discriminatory act which "adversely affect[s] the terms, conditions, or benefits[] of the plaintiff's employment."  <u>James v. Booz-Allen & Hamilton, Inc.,</u> 368 F.3d 371, 375 (4th Cir. 2004) (internal quotation marks omitted).

To establish a prima facie case of race or age discrimination, a plaintiff must show that (1) he is a member of the protected class; (2) he was subject to some adverse job action; (3) at the time of the action, he was performing at a satisfactory level and meeting his employer's legitimate expectations; and (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination. <u>See</u> <u>Coleman v. Maryland Court of Appeals,</u> 626 F.3d 187, 190 (4th Cir. 2010); <u>Bryant v. Aiken Reg'l Med. Centers Inc.,</u> 333 F.3d 536, 545 (4th Cir. 2003); <u>Karpel v. Inova Health Sys. Servs.,</u> 134 F.3d 1222, 1228 (4th Cir. 1998). Similarly, to demonstrate a prima facie case of failure to hire or promote, a plaintiff must show: (1) he is a member of a protected group; (2) he applied for the position; (3) he was qualified; and (4) the defendant rejected his application under circumstances that give rise to an inference of unlawful discrimination. <u>See, e.g.,</u> <u>Diamond v. Colonial Life & Accident Ins. Co.,</u> 416 F.3d 310, 319 n.6 (4th Cir. 2005).

The VA argues that none of the actions that Pugh complains of constitutes an adverse action.  (Doc. 27 at 10.)  It also argues that, even if any of the actions were adverse, Pugh cannot show that he was performing at a satisfactory level and meeting the VA's legitimate expectations because he was detailed away from the VIST Coordinator position due to allegations that he was mismanaging the program, which led to two separate investigations of his department.  The VA also argues that, aside from the allegations of mismanagement of VA funds and improper vendor relations, there were other concerns with Pugh's performance.  It points to the declaration of Haigh who, as the Durham VA's Assistant Director and sometimes Acting Associate Director, cites concerns that Pugh provided veterans treatment in the CAT program "over years without clear treatment plans or defined end points;" his long-term treatments were increasing costs; he used the CAT program more as a social gathering than a "clinical direct training with defined goals and objectives;" and his poor scheduling and consult referral practices - most notably, his failure to schedule consults with Moton and enter orders and progress notes for his patients into the VA's computerized patient record system in a timely fashion.  (Doc. 29-1 ¶¶ 4-6.)

As to the failure to promote claim, the VA argues that Pugh cannot show that his performance was satisfactory, or that he was qualified, for the VIST job or promotion to GS-13 because he was

detailed away from the VIST job as a result allegations that he was failing to properly manage the program that raised serious concerns about his performance in his role. (Doc. 27 at 11.)  The VA also emphasizes that Pugh cannot point to a similarly-situated comparator who received more favorable treatment.  (Id. at 11–12 (citing Haywood v. Locke. 387 F. App'x 355, 359 (4th Cir. 2010) (noting that a comparator must be "similar in all relevant respects").)  In the event that Pugh can state a prima facie case on this claim, the VA argues, it has proffered a legitimate, nondiscriminatory reason for its decision not to return him to the VIST position: VA management had "lost confidence" in Pugh's ability to continue doing the job well.  (Id.)

Pugh argues that the VA "did not present any evidence to oppose Plaintiff's claim that [the Durham VA] treated African-Americans differently or that it treated persons over 41 differently." (Doc. 35 at 11–12.)  Pugh further argues that "in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." (Id. at 11 (citing Wright v. West, 505 U.S. 277, 297 (1992).)

Pugh also contends that the VA's reasons for its actions are pretextual.  First, he denies he mishandled the VIST program. (Doc. 35 at 15–16.)  Second, he argues that the amount of money being spent on each veteran in his program was lower than the

national average and that he was operating the program pursuant to requirements mandated by the Deputy Undersecretary for Health Operations and Management in a memorandum dated June 1, 2004. (Docs. 41-3, 41-4.) Third, he argues that Moton could have accessed "the roster to determine if there were other patients who he needed to contact for his services," and that the lack of referrals to Moton was not his (Pugh's) fault. (Doc. 35 at 16.) Fourth, he argues that the VA's claim that it had lost confidence in his ability to manage the VIST program is pretext, as there was no evidence that he was unable to perform well in his role. Fifth, he argues that the VA purposefully denied him the opportunity to grandfather him in as a Hybrid Title 38 employee. Sixth, he argues that the VA Central Office report did not recommend removing him as VIST Coordinator, but instead recommended that the Durham VA "[o]ffer counseling and support to the VIST Coordinator." (Id. at 17.) Thus, to the extent that the Durham VA relied on the VA Central Office report to remove him from the position of VIST Coordinator, Pugh claims, it was mistaken. Seventh, Pugh argues that the leave policy did not require 30-days' notice for an employee to take annual leave, and that Dr. Kurian must have been referencing the wrong policy. Eighth, he argues that Dr. Kurian's treatment of him gives rise to the inference of racial discrimination. Ninth, he argues that the VA intentionally detailed him away from his role as VIST Coordinator just before he

would have been grandfathered and boarded into a Hybrid Title 38 Blind Rehabilitation Specialist, which, he claims, gives rise to an inference that the Durham VA was trying to prevent him from being grandfathered in and boarded. Tenth, he argues that Moton (who is also African-American) is similarly situated and was treated better because he was not detailed away from his position during the two investigations.[14]

Pugh also argues that the Inspector General's report notes that on December 12, 2012, the Director of the Durham VA, Deanna Seekins, and Haigh were informed that "the preliminary inquiry would be closed pending receipt of documentation from the Durham [VA] that could be used to prove whether [a VA vendor] conspired with any employee of the VA to intentionally funnel unneeded training or any information that indicated Veterans were not issued equipment for which the VA paid." (Doc. 47 at 5–6 (quoting Doc. 45).) Pugh argues that allowing "Moton's unsubstantiated allegations to be the thing [the VA] used to permanently remove [him] from his position" demonstrates pretext. (Id. at 6 (citing Reeves, 530 U.S. at 147 (noting that "in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the

---

[14] A plaintiff is not required, as a matter of law, to point to a similarly-situated comparator in order to prevail on a discrimination claim. Bryant, 333 F.3d at 545. However, Pugh is incorrect that Moton, who is not blind, is a similarly-situated comparator for these age and race claims, as he is African-American, like Pugh, and Pugh does not argue that he is under 40 years of age.

explanation that the employer is dissembling to cover up a discriminatory purpose")).)

After careful consideration of Pugh's contentions, the court concludes that summary judgment is warranted on these claims. The VA is correct that, putting aside Pugh's reassignment to Education, the actions in question (e.g., restricted access to the Surgical Service during the investigations, termination of Pugh's compressed tour of duty, loss of ability to schedule appointments, and being contacted about attempts to take leave) are not adverse employment actions because they do not "adversely affect[] the terms, conditions, or benefits[] of the plaintiff's employment." James, 368 F.3d at 375 (internal quotation marks omitted). Pugh relies heavily on his contention that being detailed away from his GS-12 position as VIST Coordinator to the GS-11 position of Special Emphasis Program Coordinator represents a reduction in position or opportunity. This is not apparent, as Pugh maintains his GS-12 status, and even though his new position was subsequently reclassified as a GS-11 position, he is still paid as a GS-12 employee and remains eligible to apply for a GS-13 position from his current position.[15] Even if the court assumes, without

---

[15] At the hearing on these motions, Pugh argued that the position he now holds is a GS-11, but agreed that he is presently classified as a GS-12. Pugh agreed that he could still apply for a GS-13 position, but argued that had he not been detailed away from his VIST Coordinator position during the Hybrid Title 38 boarding process, the VA could have looked holistically at his job duties and performance and decided that his position as VIST Coordinator should have been reclassified as a GS-

deciding, that this reassignment represents a decrease in level of responsibility as well as a loss of opportunity to be promoted, Pugh has not demonstrated evidence that the VA took this action under circumstances that give rise to an inference of discrimination of any type. See Jiminez v. Mary Washington Coll., 57 F.3d 369, 383 (4th Cir. 1995).

Pugh contends that "investigation" overstates the inquiries by the VA Central Office and Inspector General and notes that he was never charged with any criminal wrongdoing. But there is no dispute that Pugh's department was subject to a site visit and an Inspector General inquiry due to concerns about his management. As such, the record shows that the reason Pugh was detailed away from his VIST Coordinator position was simply that the VA was not satisfied with his performance. Criminal wrongdoing is not the standard for taking action against an underperforming employee. Pugh may have a different view, but "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of

---

13 position. The only evidence provided to support this claim is a document, from the VA Central Office, that lays out the descriptions of the criteria for different GS levels of Blind Rehabilitation Specialists. (Doc. 40-8.) This argument is pure speculation. The VA has produced evidence in the form of a declaration from the Chief Human Resources Officer at the Durham VA stating that because Pugh held a GS-12 position for over a year, he has credit for that service and so he is able to apply, and qualify, for a GS-13 position as well as he could have from his VIST Coordinator position. (Doc. 28-4 ¶¶ 16-17.) As such, while the court assumes, without deciding, that the change in GS level of the position that Pugh holds could have been an adverse action, it appears likely that it was not.

the plaintiff." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960–61 (4th Cir. 1996) (quoting Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980)).

Even if Pugh could make out a prima facie case, the VA has offered legitimate, detailed, non-discriminatory reasons for its actions. It had simply lost faith in his ability to perform his job - a conclusion confirmed by two independent inquiries. Pugh's arguments of pretext – which are merely denials or disagreements with the VA's well-documented actions - are unavailing.

For all these reasons, Pugh has not demonstrated that a genuine dispute of material fact exists, and the VA's motion for summary judgment as to the race and age discrimination claims will be granted.

## C. Disability Discrimination

### 1. Failure to Accommodate

As a federal employee, Pugh's disability discrimination claims may be brought under the Rehabilitation Act of 1973, 29 U.S.C. § 701. To establish a prima facie case of disability discrimination under the act, as it relates to a failure to accommodate, a plaintiff must show that (1) he was disabled within the meaning of the act; (2) his employer had notice of his disability; (3) with reasonable accommodation he could perform the essential functions of the position; and (4) the employer refused to make such accommodation. Rhoads v. F.D.I.C., 257 F.3d 373, 387

n.11 (4th Cir. 2001).

The VA argues that Pugh cannot meet the third and fourth prongs. It contends that Pugh, per VA policy, was detailed away from his position as VIST Coordinator while the CAT program was being investigated and that the VA tried to make accommodations for his disability while he was detailed to Logistics. (Doc. 27 at 14.) When it became aware that the position in Logistics was a poor fit for Pugh, it contends, it immediately detailed him to another position in the Education section that suited him better. (Id.) While Pugh does not address this claim at length, he argues that his initial placement in the warehouse did not make any accommodation for his disability. (Doc. 35 at 12–13.) He also argues that the warehouse was a dangerous location for him to work and that he never should have been sent to work there. (Id.)

The court concludes that the VA's motion for summary judgment should be granted on this claim. Even if the warehouse (or more accurately, getting to it)[16] would have presented a risk for Pugh, he appears to have been detailed there briefly before the VA assigned him to a position in the Education section. Further, the declaration from the Durham VA's Chief Human Resources Officer, who was involved in finding the proper place to locate Pugh while his program was under investigation, notes that it can be difficult

---

[16] The record reflects, and Pugh does not dispute, that transportation was provided him. (Doc. 28-2 at 22–23.)

to find a place for an employee who has to be detailed away from his usual position as a result of an investigation.  (Doc. 28-4.) Given this difficulty, and the fact that Pugh was on leave at the time that he was initially detailed away from the VIST position, the failure to accommodate claim fails.

### 2.  Disability Discrimination

To establish a prima facie case of disability-based discrimination (which also is analyzed under the McDonnell Douglas burden-shifting framework), a plaintiff must establish that he (1) is disabled within the meaning of the act, (2) was otherwise qualified for the position; and (3) suffered an adverse employment action solely on the basis of disability.  Baird ex rel. Baird v. Rose, 192 F.3d 462, 467 (4th Cir. 1999); Doe v. Univ. of Maryland Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995); Perry v. Computer Scis. Corp., 429 F. App'x 218, 220 (4th Cir. 2011) (citing Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005)).

The VA argues that Pugh cannot establish that he was otherwise qualified for the VIST Coordinator position because he was not meeting the VA's performance expectations, as evidenced by the fact that his program was subject to two investigations.  The VA also argues, as it did on the failure to accommodate claim, that Pugh's detail to Logistics, and then to Education, was not discriminatory because the VA was simply trying to find work that

he could do.  Even if Pugh can make a prima facie case, the VA argues, it had non-discriminatory reasons — Pugh's performance — for its actions, and Pugh cannot demonstrate they were pretextual. (Doc. 27 at 16.)  Pugh argues that, while he was on leave for almost five months, the VA could, and should, have found him a more reasonable accommodation than the Logistics position, where he was given an "unsafe and dangerous environment to work in." (Doc. 35 at 12.)

Here, too, there is no genuine dispute of material fact, and this claim cannot survive summary judgment for reasons very similar to those explained above for the failure to accommodate claim. Namely, it is not clear that Pugh has suffered an adverse action. But even if he has, Pugh's removal from his VIST Coordinator position was a result of his performance, not disability discrimination.  There is no indication that the VA's actions were at all motivated by Pugh's disability or that Pugh was placed in the warehouse because of any disability.  Finally, while Pugh's placement in the warehouse may have been ill-advised, the VA acted promptly to find a more suitable environment for him as soon as he actually returned and began working at the warehouse. Consequently, this claim fails.

D.    **Retaliation**

Pugh claims retaliation under Title VII.  (Doc. 35 at 13.) To state a prima facie retaliation claim under Title VII, Pugh

must establish that (1) he engaged in a protected activity; (2) his employer took a materially adverse action against him; and (3) a causal connection exists between the protected activity and the adverse action. Coleman, 626 F.3d 187 at 190; Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Perry, 429 F. App'x at 220. If a plaintiff succeeds in making a prima facie retaliation claim, the burden shifts to the defendant to produce evidence that its actions were not retaliatory. Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015). If the defendant does so, then the plaintiff must show by a preponderance of the evidence that the defendant's asserted grounds for taking its action were a pretext for retaliation. Id.; Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 216-17 (4th Cir. 2016). To establish pretext in a Title VII retaliation claim, a plaintiff must show that his protected activity was a "but-for" cause of the adverse employment action. Nassar, 570 U.S. at 358-361 (2013). When proceeding under the burden shifting framework, this is met by showing pretext and that discrimination was the "real reason for the challenged conduct." Foster, 787 F.3d at 252. In the retaliation context, the standard for what constitutes an adverse employment action is not as stringent as that for employment discrimination. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64-68 (2006) (noting that the adverse action component of Title VII's antiretaliation provision can be satisfied by showing

that the employer took "materially adverse" action in response to an employee engaging in a protected activity "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination") (internal quotation omitted).

The VA argues again that it has not taken a materially adverse action against Pugh. (Doc. 27 at 22.) Second, it contends that detailing him away from his VIST Coordinator position could not have been retaliatory because it happened before he engaged in protected activity. (Id.) Third, it argues that Pugh cannot show that he was not selected for the second VIST position, or returned to his original VIST Coordinator position, because of his EEO activity. Instead, the VA contends that Pugh was not considered for the open VIST Coordinator position because he still technically held the VIST Coordinator position at the time he applied, despite being detailed away from it, while the investigations of the VIST section were ongoing. Lastly, the VA argues that neither Pugh's detail to the Education section (on October 15, 2012) nor its choice to hire a different VIST Coordinator (which occurred in December 10, 2012), was close enough in proximity to Pugh's EEO activity to constitute retaliation, where Pugh made first contact with EEO on July 16, 2012, and filed his formal complaint on October 30, 2012.

Pugh argues that the VA's decision not to reinstate him was

29

made on October 22, 2012, when it posted that it was hiring a VIST Coordinator. (Doc. 35 at 13.) He also notes that the VA hired a new VIST Coordinator five months after the results of the first investigation of the VIST program were published in a report.

In a retaliation claim, timing is key. At the outset, it is clear that many of the actions Pugh complains of took place before he filed his first EEO complaint. Specifically, the alleged denial of his sick leave, the limitation on his access to Surgical Services, termination of his compressed tour of duty, and his being detailed away from his position as VIST Coordinator all took place before he filed his first EEO complaint. As such, there can be no causal connection between those actions and Pugh's engagement in protected activity.

Further, as has already been discussed, the VA has produced evidence that it removed Pugh from his position as VIST Coordinator and declined to reinstate him to that position because of "several significant deficiencies" in performance, as identified by the VA Central Office inquiry. (Doc. 27-2 at 160.) The VA determined that the deficiencies were "primarily performance related and not of a deliberate conduct issue," but that "management ha[d] lost confidence in [his] ability to successfully manage the VIST program." (Id.)

Pugh argues that the VA's reasons for not reinstating him as VIST Coordinator were pretextual because they are too vague.

However, the record demonstrates that the VA had legitimate concerns about Pugh's performance as VIST Coordinator, which led it to believe someone else should fill the position.  See Evans, 80 F.3d at 960 (noting that it is "the perception of the decision maker which is relevant").  Thus, Pugh cannot show that but-for his having filed his EEO complaint, he would have been reinstated to his position as VIST coordinator.  Foster, 787 F.3d at 250.

For these reasons, the VA's motion for summary judgment on Pugh's claim of retaliation will be granted.

**E.   Hostile Work Environment**

To survive summary judgment on Plaintiff's hostile work environment claim, Pugh needs "to demonstrate that a reasonable jury could find that they suffered workplace harassment that was '(1) unwelcome, (2) based on race [or other protected status], and (3) sufficiently severe and pervasive to alter the conditions of employment and create an abusive atmosphere.' [He] also need[s] to demonstrate that 'there is some basis for imposing liability' on [the defendant] for this harassment." White v. BFI Waste Services, LLC, 375 F.3d 288 (4th Cir. 2004) (quoting Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir.2001)).  The Fourth Circuit recently noted that to prevail on a hostile work environment claim, a plaintiff must establish that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his]

employment and create an abusive working environment." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

The VA argues that Pugh has failed to show that he was the victim of harassment based on his race, age, or disability. (Doc. 27 at 17–18 (citing Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007)).) It further argues that the alleged harassment was not sufficiently severe or pervasive to alter the conditions of his employment and create an abusive atmosphere, noting that "the standard for proving [a hostile] work environment is intended to be a high one" and the conduct must be "extreme." (Id. at 18–19 (citing Karim v. Staples, Inc., 210 F. Supp. 2d 737, 752 (D. Md. 2002); EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008) (noting that rude or unprofessional conduct does not amount to illegal discrimination)).) Pugh argues that Dr. Kurian's alleged conduct (such as questioning his ability to take leave, calling him a "lone wolf," stating that the VA needed to "reel his ass in," and generally being unfair towards him) establishes a hostile work environment claim.

The court will grant the VA's motion for summary judgment on this claim, as Pugh has failed to proffer evidence sufficient to make out a prima facie case. None of these allegations, accepted as true for the purposes of this motion and either alone or

collectively, is sufficiently severe or pervasive to give rise to a hostile work environment claim.

**F.    Whistleblower Protection**

Finally, Pugh contends he has brought a claim under the Whistleblower Protection Act.  The VA argues that, to the extent the complaint alleges such a claim, it must be dismissed because Pugh did not first exhaust his administrative remedies.  See 5 U.S.C. §§ 1214(a)(3)(i–ii) & 1214(a)(3)(B).  The VA also notes that "because the district court lacks jurisdiction to hear Pugh's whistleblower claim in the first instance, it also lacks the power to excuse his failure to exhaust his administrative remedies." (Doc. 42 at 2–3 (citing Stella v. Mineta, 284 F.3d 135, 144 (D.C. Cir. 2002)).)  Pugh contends that he did not file a claim under the act with the Merit Systems Protection Board because "he had dual claims of discrimination" and is permitted to proceed in this court.  (Doc. 47 at 3.)

Even if Pugh is assumed to have exhausted his administrative remedies as to this claim, the problem is that it is not before the court.  While the complaint mentions that Pugh has been the victim of "Reprisal/Retaliation" for his contacting the VA Secretary, Congress, the Blind Veterans Association, and the National Blind Rehabilitation Service Central Office, it seeks recovery under several specific federal laws but contains no claim under the Whistleblower Protection Act.  To the contrary, it

alleges that Pugh had a second EEO complaint pending at the time he filed the present action and that this other EEO complaint included a "Whistleblower Protection" claim. (Doc. 2 at 4.)[17] This court has already ruled, however, that Pugh's second EEO complaint is not before the court. (Doc. 22.) Therefore, the court finds that Pugh has not included a claim under the act in his complaint in this case.

## III. CONCLUSION

This case began as an effort by the VA to investigate questionable actions of a long-term employee permitted to work with little oversight. Management's heightened concerns led it to call in the VA's Central Office for an independent investigation, which in turn recommended an inquiry by the Office of Inspector General over possible financial wrongdoing. As a result of the reports and recommendations of these inquiries, on top of previously-existing concerns over the employee's performance, the Durham VA lost confidence in the employee's ability to perform his job and reassigned him to a position of equal pay and responsibility. In response to the VA's effort to root out poor performance and modify its practices to improve patient services, the employee resisted and claims these changes were pretextual and

---

[17] Oddly, the second EEO complaint does not actually contain any reference to any sort of whistleblower protection claim.

the product of discrimination against him.  Based on this record, no reasonable jury could reach that conclusion.

For the reasons stated, therefore,

IT IS ORDERED that the Secretary's motion for summary judgment (Doc. 26) is GRANTED, each of Pugh's claims is DISMISSED WITH PREJUDICE, and the motion to strike (Doc. 51) is DENIED as moot.


                                    /s/   Thomas D. Schroeder
                              United States District Judge

April 5, 2018